UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**PAUL J. SALVADOR,**                                        Chapter 7
     Debtor                                       Case No. 14-10509-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re

**WALTER W. SALVADOR,**                               Chapter 7
     Debtor                                       Case No. 14-10510-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ANDREW S. KAPLAN, as Personal**
**Representative of the Estate of David B.**
**Kaplan,**
     Plaintiff
v.                                                                  Adv. P. 14-1141
**PAUL J. SALVADOR,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**ANDREW S. KAPLAN, as Personal**
**Representative of the Estate of David B.**
**Kaplan,**
     Plaintiff
v.                                                                  Adv. P. 14-1142
**WALTER W. SALVADOR,**
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

<div align="center">

**MEMORANDUM**

</div>

## I. INTRODUCTION

The matters before the Court are the substantially identical, three-count Complaints filed on July 16, 2014 by David B. Kaplan against Paul J. Salvador and Walter W. Salvador (collectively, the "Debtors," individually "P. Salvador" and "W. Salvador").

<div align="center">

1

</div>

Pursuant to his Complaints, David B. Kaplan sought the denial of the Debtors' discharge under 11 U.S.C. §§ 727(a)(2)(A) and (a)(3), and an exception to the dischargeablility of the Debtors' obligations to him in the total sum of $744,764 under 11 U.S.C. § 523(a)(2)(B).[1] Approximately eight months later, on March 23, 2015, Andrew S. Kaplan, as Personal Representative of the estate of David B. Kaplan filed, pursuant to Fed. R. Civ. P. 25(a), made applicable to these proceedings by Fed. R. Bankr. P. 7025, Motions to Substitute himself for David A. Kaplan who passed away on October 7, 2014.  On April 8, 2015, this Court granted the Motions in each adversary proceeding.  Accordingly, Andrew S. Kaplan, in his capacity as personal representative, is now the Plaintiff in these proceedings.[2]

On September 12, 2016, this Court conducted a pretrial conference in both adversary proceedings at which the parties agreed to consolidate the two proceedings for trial.  In addition, the Court determined that the counts under 11 U.S.C. §§ 727(a)(2)(A)

---

[1] The Court may take judicial notice of its own docket. *See* LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999) ("The bankruptcy court appropriately took judicial notice of its own docket.").
     By way of background, on February 18, 2014, David B. Kaplan filed Emergency Motions for Relief from the Automatic Stay to continue matters pending in the Norfolk Superior Court, Department of the Massachusetts Trial Court in the bankruptcy cases of each Debtor.  Warren E. Agin, Esq., the Chapter 7 Trustee appointed in both cases, assented to the Motions.  The Debtors filed Responses to the Motions in which they recognized that because that the Chapter 7 Trustee of their respective bankruptcy estates owned their stock in Salvador & Company Insurance Agency, Inc., they lacked standing to object to the Motions.  On February 25, 2014, this Court entered orders granting Kaplan relief from the automatic stay in both of the Debtors' bankruptcy cases.

[2] The Court shall refer to the Plaintiff as either the "Plaintiff" or "Kaplan," whether David A. Kaplan or Andrew S. Kaplan.

and (a)(3) would be tried first and, thereafter, if necessary or appropriate, the Court would try the count under 11 U.S.C. § 523(a)(2)(B).

The Court conducted a trial on January 17, 2017.  At the trial, four witnesses testified, including the Debtors, and six exhibits were submitted into evidence.  In addition, the parties agreed to the admissibility of the deposition transcript of Brian W. Steen ("Steen"), a certified IT professional with 20 years of experience.

The issues presented are whether the Plaintiff sustained his burden of proving that the Debtors are not entitled to a discharge because they either 1) with intent to hinder, delay, or defraud Kaplan, removed, destroyed, mutilated, or concealed, or permitted the removal, destruction, mutilation, or concealment of their property within one year before the date of the filing of their bankruptcy petitions; or 2) concealed, destroyed, mutilated, falsified, or failed to keep or preserve recorded information, including books, documents, records, and papers, from which their financial condition or business transactions, in particular those of Salvador & Company Insurance Agency, Inc. (the "Insurance Agency"), might be ascertained.

The Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(J) and 1334.  These are core proceedings, and the Debtors do not contest the Court's jurisdiction.

## II. FACTS

### A. Agreed Facts

The Debtors filed Chapter 7 petitions on February 11, 2014.   Prior to the commencement of the trial, the parties in each adversary proceeding filed a Joint Pretrial Memorandum in which they agreed to numerous facts. The Joint Pretrial Memoranda

filed in each adversary proceeding were virtually identical.  The Court paraphrases the agreed facts as follows.

On or about April 30, 2008, Kaplan loaned $100,000.00 (the "First Loan") jointly and severally to the Debtors, John P. Horan ("Horan"), and Ernest A. Enos, Jr. ("Enos"). On or about October 29, 2008, Kaplan loaned $120,000.00 (the "Second Loan") (together with the First Loan, the "Loans") to the Debtors, Horan, and Enos.

Before making the First Loan, the Debtors submitted to Kaplan financial statements which purported to provide "correct and complete" statements of their financial condition as of September 30, 2007 (the "Financial Statements").  At the time Kaplan made the Loans, the Debtors owned and were the principals in, and officers of, the Insurance Agency.  The Debtors each owned a fifty (50%) percent interest in the Insurance Agency.  The Financial Statements placed values on the Debtors' ownership interests in the Insurance Agency[3] and on the Debtors' ownership interests in four other entities:  Salvador & Company Mortgage and Financial Services Corp., Salco Ocean Marine Corp., EHS Shipping, and Laila Shipping Company as follows:

---

[3] On Schedule B - Personal Property, P. Salvador and W. Salvador listed interests in the Insurance Agency ascribing no value to their interests.

| Description and Basis for Valuation | Value of Each Debtor's Interest |
|---|---|
| Salvador & Company Insurance Agency Inc.; 50% ownership interest held by each Debtor | $500,000[4] |
| Salvador & Company Mortgage and Financial Services Corp.; 50% ownership interest held by each Debtor | $290,000 |
| Salco Ocean Marine Corp.; 50% ownership held by each Debtor | $50,000 |
| EHS Shipping Inc.; 25% ownership interest held by each Debtor | $374,000 |
| Laila Shipping Company; 17% ownership interest held by each Debtor | $129,200 |
| TOTAL | $1,343,200 |

The Debtors defaulted on the Loans.  On or about February 22, 2011, Kaplan commenced a civil action against them, Horan, and Enos in the Norfolk Superior Court (the "Superior Court"), Civil Action No. 2011-00261 (the "2011 Action"), to collect on the Loans.  In the 2011 Action, Kaplan named the Insurance Agency, among other entities, as a reach and apply defendant.

The Insurance Agency had been engaged for many years in the business of selling and servicing policies of insurance to commercial and consumer purchasers.  While under the control of the Debtors, the Insurance Agency had developed a substantial clientele of policyholders and good will.

---

[4] Thus, according to the Financial Statements, the value of the Insurance Agency in September of 2007 was $1,000,000.

On August 30, 2012, the Superior Court entered summary judgment in favor of Kaplan and ordered the Debtors to turn over to him all stock or other form of ownership interest in the Insurance Agency. On the same day, the Superior Court issued judgment, in favor of Kaplan and against the Debtors in the amount of $643,520.47, plus attorneys' fees in the amount of $30,373.00 and costs of the action.

The Debtors appealed the judgment to the Massachusetts Appeals Court. The Massachusetts Appeals Court vacated the award of attorneys' fees but otherwise affirmed the judgment of the Superior Court.

On October 1, 2013, after remand, the Superior Court, issued a judgment in favor of Kaplan in the amount of $744,764, an amount which included pre-judgment interest of $85,801.00, but not post-judgment interest. As the personal representative of the estate of David B. Kaplan, Andrew S. Kaplan is a judgment creditor of the Debtors.

The Superior Court appointed John F. Hegarty as receiver of the Insurance Agency ("Hegarty" or the "Receiver"), and it appointed Richard Blumenthal, Esq. as special commissioner (the "Special Commissioner") to sell the shares of capital stock of the Insurance Agency. On December 13, 2013, the Superior Court ordered the Debtors to, among other things, turn over all of the books and records of the Insurance Agency to the Receiver, and it authorized the Special Commissioner to immediately sell the capital stock and/or assets of the Insurance Agency.

Shortly after his appointment, the Receiver requested all paper and computer files belonging to the Insurance Agency from the Debtors. In early February 2014, prior to the filing of their bankruptcy petitions, the Debtors turned over the computer server, desktop

6

computers, copier, fax machine, and paper files of the Insurance Agency to the Receiver.

Specifically, the Debtors turned over eight or nine file cabinets containing paper files to

the Receiver.

B. <u>Facts Adduced at Trial</u>

1. *The testimony of Receiver, William C. Bearce, III, and the Debtors*

The Receiver testified that he was the owner of Commonwealth Insurance Partners

located in Quincy, Massachusetts and had seventeen years experience  with that entity, a

property and casualty insurance agency offering services to consumers and commercial

entities.  He indicated that he was knowledgeable about how insurance agencies operate

and that he had been involved in the purchase and sale of insurance agencies.  As a result

of his extensive experience, he had familiarity with the kinds of documents typically kept

by insurance agencies, as well as recordkeeping requirements, computer practices, and

software programs used by insurance agents.  Specifically, he indicated that he was

knowledgeable about "AMS" or "Prime" software programs, stating that AMS stands for

"agency management system . . . [or] . . .  documenting system for your client base"  In

his words, the program would store a list of clients "both from the auto and home side,

data filing.  You could have some accounting records on there showing your commission

statements and whatnot as you process through rectifying and reconciling your accounts,

your agency."  In sum, the AMS program would identify all the agency's customers, the

status of their policies, and information about their applications for insurance policies,

although the insurance applications themselves would be kept as paper records with

customers' signatures.  In the event an agency elected to be "paperless," Hegarty testified

there would be scans of the actual policies, with the scans and the policyholders identified

through a name or code.  Nevertheless, he indicated that "[i]n my experiences . . . [it is] .

. . not possible to be completely paperless."

After his appointment, the Receiver undertook the responsibility of securing the

assets and records of the Insurance Agency.  Initially, he notified carriers, namely

Commerce Insurance and Hingham Mutual, that the Insurance Agency represented of

his appointment.  On February 3, 2014, he visited the offices of the Insurance Agency,

located at 111 Main Street, Bridgewater, Massachusetts, where P. Salvador also resided

according to his Chapter 7 petition.  Hegarty was unable to gain entry and returned the

next day.  At that time, the Debtors were present, as well as Mark Salvador.  Hegarty

testified about what he found at the premises:

> Most of the equipment, as I got -- went into the premises was piled up in
> the front of the agency office. And there was another section of some boxes
> put together in the middle of the room, essentially on the side setup.

Hegarty added that "[i]t looked to be some older computer equipment, some keyboards.

There looked to be a copier machine. There looked to be some desktops with some screens

. . . [and] monitors . . . ."  He also stated that there was one CPU unit in the pile of

equipment.  With respect to the boxes, he testified that "[t]hey looked to contain supplies

from the office, paper supplies and some envelopes."  He did not obtain any records,

including policy information or customer lists belonging to the Insurance Agency, or any

other written documents that would have allowed him to determine the identity of the

Insurance Agency's customers.  The Receiver testified that he was told by the Debtors

that their agency was "paperless," but he did not observe any scanners in the office.  He

testified that he was told by the Debtors that the Insurance Agency did not possess a

scanner. On cross-examination, however, he admitted that he did not check the copy

machine which may have incorporated a scanner.

Hegarty indicated that, after his initial assessment of the Insurance Agency's

operations and personal property, he planned to return to the premises to retrieve the

equipment, using the services of a moving and storage company, Burton Frame and

Trailer, Inc. of Pepperell, Massachusetts. When he arrived two days later, he observed

essentially the same equipment that was in the main office on Tuesday. At that time, the

Debtors directed him to file cabinets in the basement that contained paper files, which he

determined were outdated. The Receiver had the equipment moved and stored, but took

the computer equipment to his office in Quincy, Massachusetts. The Receiver arranged

for the transportation and storage of the paper records in the file cabinets, as well as the

remaining equipment, all of which he later turned over to the buyer of the Insurance

Agency.

The Receiver engaged Brian W. Steen ("Steen"), a senior consultant and project

engineer with NSK, Inc., an IT management company, who was formerly employed by

an information technology company known as Silver Sword. Steen undertook an

examination of the server and a work station that the Receiver had removed from the

Insurance Agency. Hegarty testified that he "thought it would be important to have an

IT professional review [the computer server] and do a backup of the system to secure any

data if there was data on it." Hegarty obtained the computer password from the Debtors

and testified that Steen was the first person to turn on the computer and monitor and

access the server after he arranged for their transport to his office location in Quincy.

Following Steen's examination of the computer equipment, Hegarty testified that he

learned that there was no information on the server concerning either the customers or

accounts of the Insurance Agency.

Hegarty also testified that after Steen's examination of the computer, Horan, the

Insurance Agency's accountant, sought to obtain accounting information from

QuickBooks program on the computer.  He was unsuccessful in his efforts.  During his

deposition, which took place on June 24, 2014, portions of which were accepted into

evidence, Horan, corroborated the Receiver's testimony.  He stated that he "couldn't get

access to the file," clarifying that the file was on the server, but was inaccessible.

Although Hegarty did not obtain customer lists from the Insurance Agency, he

testified that he eventually obtained customer lists from Commerce Insurance Agency

and NLC Insurance.  He reached out to approximately eight to ten potential buyers of the

Insurance Agency's assets, including its customer list and financial information, as well

as its computers, paper files and "any data that would be supportive of the customer

bases of the agency."  He testified that he received two written offers and one verbal offer

and eventually sold the Insurance Agency and its equipment to Bearce Insurance Agency,

Inc.

William C. Bearce, III ("Bearce"), the owner of the Bearce Insurance Agency, Inc.,

testified his agency's acquisition of the Insurance Agency.  Initially, he described his

agency as "a general insurance agency doing . . .  property and casualty," adding that it

had "a little division that does life insurance and pensions and things like that, so [a]

general insurance agency" with nine employees.  One of the offices of the Bearce

Insurance Agency, Inc. is located in Bridgewater, directly across the street from the

former agency owned by the Debtors.  Bearce testified that he was contacted by Hegarty

and expressed an interest in acquiring the Insurance Agency.  Accordingly, after signing

a non-disclosure agreement, he obtained so-called company reports, which he described

as information that "basically tells you the gross amount of business that's being written

by some of the customers."  The reports did not contain a customer list but were rather

an aggregation of all the customers of a particular carrier.

Bearce, who had acquired insurance agencies in the past on behalf of his agency,

testified that the customer list is the most valuable component of a purchase.  He stated

that the customer list of an acquired insurance agency was better than any list obtained

from insurance carriers.  He explained:  "Well, the agency's records have much more

detail.  They have better addresses, generally more up-to-date addresses, they might have

phone numbers, they might have email addresses, they'll have a wealth better -- more –

better information."  He added:

> [T]he continuing relationship with the customer is the key economic driver
> in acquiring an agency. And if you don't have good information or you
> don't have any information, you have to build that information or find it or
> somehow create it. And so when you make an estimate, you have to (a) put
> in the time and the money we're going to have to invest to get it, but also
> the -- is it going to be reliable. It's not going to be as sound as what you'd
> get in a -- what I would say would be a normal transaction.

Bearce Insurance Agency, Inc. acquired the Insurance Agency from the Receiver

on March 18, 2014.  It made a $25,000 down payment, and Bearce anticipated a total price

"[s]omewhere north of $500,000."  Bearce stated that the purchase price was to be paid

over 48 months and computed by paying two times the annual income from the agency with the payments based on one-forty-eighth of that number, adding that "in this particular instance it's a running number because it's a full retention situation. So it's only -- we're only paying upon what business we retained."  At the trial, approximately two years into the contractual payment stream, he indicated that it was not possible that he would be paying more than $500,000.

Bearce also testified that, after the purchase, he never obtained a customer list for the Insurance Agency from Hegarty and only obtained lists from its carriers.  Hegarty delivered two computers and four boxes of supplies to the Bearce Insurance Agency, Inc. Bearce testified that he was never able to obtain useful information from the computers. Moreover, he stated that he examined the copier that was in storage and determined that it did not have a scanner and was too old to warrant the expense of moving it. Additionally, he examined the paper files and determined that they were outdated; in his words, they were "dead files."  Because those paper files contained confidential information, Bearce arranged to have them shredded.

Following the purchase of the Insurance Agency, Bearce testified that he observed that insureds, whose policies the Bearce Insurance Agency, Inc. acquired the rights to service, were moving their business to DeOliveira Insurance in Mashpee, Massachusetts. Bearce testified that he observed unusual activity with respect to renewals.  He stated: "it's unusual that a single agency remote from our location would take over this number of accounts," adding that the take-overs occurred not only at the time of policy renewals,

12

but also mid-term.  He explained that it was especially unusual for insureds to move their policies from one agency to another mid-term because of an associated penalty.

W. Salvador testified that he did not destroy or "scrub" the Insurance Agency's server, and did not instruct anyone to do so.  He denied using computers at the Insurance Agency between Hegarty's initial visit and his return visit when he collected the server and other computer equipment.

W. Salvador testified that the Insurance Agency used an agency management system known as "Prime," which enabled it to keep old client information, as well as stored information such as dates of birth, Social Security numbers, addresses, phone numbers, and places of employment.  With respect to the server, W. Salvador stated that it was operational until Hegarty unplugged it.  He also stated that the passcode which would enable Hegarty to access information on the server was "on a sticky on the server itself."  Nevertheless, according to W. Salvador, the AMS system would be discontinued in the event the Insurance Agency failed to pay its bill, adding that the Insurance Agency did not pay its bill in December of 2013, a circumstance that he testified would have resulted in denial of access.  W. Salvador also testified that he could not recall advising Hegarty that the bill was unpaid, but he stated that he notified his attorney at the time.

W. Salvador was responsible for entering financial information into QuickBooks, as well as information into the AMS system, and did so through November of 2013.  He testified that he assembled all the information Hegarty requested.

P. Salvador denied destroying the Insurance Agency's server, instructing anyone to do that, or "scrubbing" the server.  He admitted, however, that personal records were

deleted from the server by "Doug." He further testified that he and his brother, known as Bill, went into the insurance business together in 1979, forming the Insurance Agency, and that the agency "went paperless" in 2010 or 2011. He stated that the scanner was built into the copy machine.[5] In addition, he admitted that the agency's accountant would have to have accessed the server to understand its business transactions.

P. Salvador testified that he was present when the Receiver visited the premises occupied by the Insurance Agency and offered to show him the server and its contents. According to P. Salvador, Hegarty informed him and W. Salvador that he was going to take the server and put it in storage. P. Salvador testified that he did not access the computer on February 3, 2014, February 5, 2014, or February 6, 2014. Moreover, he testified that he was not as familiar with the AMS system as his brother and sons were, stating "I was not involved with that part of it."

P. Salvador also testified that, around the time the Receiver was appointed, he was "winding down" from his position with the Insurance Agency and collecting Social Security. He added that although he was still involved "I think the kids were operating more and more." By kids, he meant his son, Mark, and niece Christy Robbins, who is W. Salvador's daughter.

---

[5] P. Salvador explained:

> When I purchased it, I purchased it from a friend of mine who rebuilt it. It was an old model, but he rebuilt and put a scanner on it, which would allow us because the other scanners we had, which we got rid of prior to 2014 were – they could only scan one document at a time, so we got this document [sic] that could do many.

P. Salvador denied purposely closing the Insurance Agency, although it was not open for business when the Receiver initially visited its premises.  He stated that the Insurance Agency "vacated February 1st."  Although P. Salvador testified that he was not operating the business, he was aware that Mark Salvador and Christy Robbins formed their own insurance agency, known as Insurance Connection, Inc., which operated at the same location in Bridgewater as the Insurance Agency.  Indeed, P. Salvador admitted soliciting over 200 customers of the Insurance Agency for the Insurance Connection.  He insisted he was permitted to do so by "the courts," stating the following:

> Most of the customers that I personally talked to were family members, friends I've known for 40 years. They knew what was going on.  My sister, for example; my brother-in-law; other people in my family, cousins, aunts and uncles. Yeah, I talked to them.

Indeed, in an order entered on December 13, 2013, Associate Justice Patrick J. Brady struck certain provisions from a proposed order, including one that would have prevented the Debtors from engaging in a business that would compete with the Insurance Agency for two years from the date of the order.  Having failed  to obtain such a restraint on competition before Justice Brady, Kaplan subsequently sought an Ex-Parte Temporary Restraining Order and Preliminary Injunction against the Debtors, as well as their agents, employees, servants, and assigns and all persons acting in concert, participation or combination with . . . [them] . . . including without limitation, Mark Salvador . . . and Christy Robbins . . . ."  That motion was heard by Justice Garsh and although Justice Garsh initially issued a temporary restraining order, she dissolved it,

effective as of March 10, 2014 at 4:30 p.m. owing to Justice Brady's prior inconsistent rulings.[6]

2. The Testimony of Brian W. Steen

The parties agreed that the testimony of Steen at his deposition would be admissible as his trial testimony. Steen testified about his credentials and responsibilities with both NSK, Inc. and Silver Sword, noting that he was involved in the "design and installation of corporate networks, servers, security systems and phone systems, and also disaster recovery services for failed network equipment." He is a "Microsoft Certified Professional for Server 2012 and desktop operating systems" and holds an "A Plus" certification related to hardware diagnostic testing. In addition, he testified that he has

---

[6] The Order, which was dated March 7, 2014 provided the following:

> Denied. The plaintiff has shown a likelihood that the defendants will attempt to dissipate the goodwill (an asset) of Salvador & Co. Insurance Agency, Inc. and that an order precluding both solicitation (Not competition) and opening a competitive business within a 25 mile radius that uses a similar name would prevent the dissipation and interference with assets, actions prohibited by the injunction entered in this case. However, this Court (Brady, J.) specifically denied a request for similar relief and then denied a motion for reconsideration, facts that were not brought to this court's attention when the ex parte T.R.O. was requested. It is now clear to this court that J. Brady did not intend the anti-dissipation order to prohibit the kinds of actions plaintiff once again seeks to prohibit. Plaintiffs represents [sic] that the ruling is on appeal. If the plaintiff believes that the anti-dissipation order was actually intended by J. Grady to, in effect, overturn his two previous denials, plaintiff could have and can seek a motion to clarify before J. Brady. It would be inappropriate for this court to revisit whether the plaintiff is entitled to an anti-solicitation order or an anti-operating – competing business under similar name order. The Temporary Restraining Order will be dissolved at 4:30 p.m. on Monday, March 10, 2014.

held other certifications such as one for a Cisco engineer that enables him "to administer and install Cisco firewall appliances. Steen testified that he regularly enrolls in educational programs and workshops and is familiar with QuickBooks.

Steen stated during his deposition that Hegarty contacted Silver Sword for the purposes of retrieving data, verifying the functionality of the server obtained from the Insurance Agency, and copying data. Steen's employer directed him to travel to Hegarty's office "to actually see if the server would function, because they [Hegarty and his office manager and controller, Sharon Viveiros ("Viveiros")] had been unable to get it to work once he brought it to the office." Steen was told by Viveiros, that the Receiver was looking for financial and insurance customer data and the server came from a company in receivership.

Steen stated that he "assembled the server with monitor, keyboard, plugged it into a network switch that was not part of the Commonwealth network." He examined the server and a work station using spare keyboards and "mice" from Hegarty's agency, although Steen stated he brought Microsoft Server 2000, 2003 and 2007 discs for small businesses, as well as Work Stations 2000 XP, Windows 7, and Windows 8, data recovery software (i.e., EaseUS and GetDataBack), and other software and equipment with him to assist him in his work.

Steen testified that once he got the server running he learned that QuickBooks had at one time been installed on the server, finding a single file for one database for the Insurance Agency which was accessed or modified in February of 2014. After changing the QuickBooks password, he was able, after contacting and obtaining the assistance of

17

an engineer at Intuit, the maker of QuickBooks, to log on to QuickBooks from the workstation and run the program.  Nevertheless, he ascertained that the only data in the QuickBooks files he could access was outdated.

Referencing a server screen shot and a backup folder identified as "servveritas," Steen stated that "[t]here was an indication that the backup had completed once. . . . I believe towards the end of 2013, not even in 2014."  Steen found no backup on either the server or the workstation computer.  Steen also noted the existence of a "Scan" folder "where an external scanner would have been able to scan documents to [sic].  There was indication that files had been scanned there, but that's usually a temporary situation."  In other words, scanned documents would go into the scan folder and then be accessed and moved to another location.  He testified that he did not find any Word documents or Excel spreadsheets on the computers.

Again, referring to the server screen shot, Steen discussed files in the so-called "New Volume D" folder or D drive, including the AMS subfolder that contained documents, the Data subfolder which did not contain documents, the I386 subfolder which was an installer copy of the Windows Server 2003, the Live Update subfolder, as well as several other subfolders.  The AMS subfolder, the QuickBooks subfolder and the TQ55folder, an application subfolder, were recently accessed and last modified on February 3, 2014, February 6, 2014, and February 5, 2014, respectively.

Steen testified about a screen shot of the QuickBooks subfolder. Within that subfolder there were eight types of files, three of which appeared as "Salvador & Company Insu [sic]", namely a QBW File, a ND File and a TLG File, all of which were

accessed and modified on February 6, 2014 at 8:14 am. According to Steen, the only file with functional data was the QBW file, i.e., "the current Company file." According to Steen, the "date modified" information told him that "someone was in the program itself and made changes to the program. They entered or removed data." Steen testified that these were the same QuickBooks files that he stated were outdated, but he admitted that he could not discern what was done to the QuickBooks file on February 6, 2014 without the backup files which he did not discover.

Steen also testified about a screen shot of the personal computer (workstation) that the Receiver obtained from the Insurance Agency's premises showing the user folders and user documents. There were five users: Bill [W. Salvador], Christy, Doug, Mark and Paul [P. Salvador]. Steen concluded from the screen shot that "from the activity and date modified that there were five users and they all had logged on between February 3rd of 2014 and February 6th of 2014." He noted, however, that anyone with the access password and login of the five users could have modified the files. Steen testified that he could open up the folders to look inside and that when he did so there were no documents that he could find in any of the subfolders for any of the users, including their "My Documents" folders, other than a few pictures and music files. In other words, he stated that he found no Word documents, no spreadsheets, and no Microsoft Office files even when he utilized his data recovery software. He stated that when he ran the EaseUS software he found some folders that had been deleted, adding that he could not restore any of the data. In his words: "there's a lot of files that were called orphan or lost files.

These are previously deleted files that have lost too much structure to be restored and

opened." He explained that a file becomes an orphan file when the following occurs:

> [i]t gets deleted and then something gets written over it on the hard drive
> and then when you try to restore it, it no longer has an index value or type
> of file, so you can't really tell what it is. There are ways to recover from that,
> but they take hours to run.

He concluded that he knew that "files have been deleted and they were deleted by

someone who had access to the server." Steen stated that files were intentionally deleted

and that, after testing, the lost files were not the result of a corrupted hard drive. Steen

also observed in his testimony that it was possible that the files could have been deleted

unintentionally, but "you would have had to select quite a number of files and done it all

at the same time. In the case of the server, you'd have fifty files underneath the data file

and you'd have to delete them all and select them all." He also noted there were no files

in the "recycle bin." He concluded from his investigation that "We were able to say that

documents had been deleted. As to the intent, that's unknown." He also stated that "it's

quite possible a program had been used to scrub some files. That would explain the

inability for either software package [EaseUS and GetDataBack] to recover files

themselves." Thus, in his view because the data recovery programs would find a single

deleted item if it had just been deleted, the only explanation was that a program was used

to scrub the contents of the computer.

Steen spent nine hours at the office of Commonwealth Insurance Partners. He

reiterated that there was data in the AMS Prime folder but he could not access it because

there was no program associated with it. He tried to download a version of the software

but the newest version available was not the same version for which the Insurance Agency had a license.  In addition, he testified that the QuickBooks application was on the server and had been shared by workstations.  Nevertheless, the network connection had been severed and there were records in the logs, which were "just a few days old," of shared folders having been deleted.  There was no software on the workstation because it had been removed.

Steen testified at his deposition that he could have accessed the AMS Prime application, even if payment had not been made for it.  He stated:  "It would - - basically without the license being up to date, paid for, you wouldn't be able to download any new functions except for trial software, which - - but that's what we initially tried to do.  But the version they had wasn't available." He added:  "If it had been still installed on a workstation or the server, you could have still opened the data.  The failure to pay for the license for that year or the service contract doesn't prevent you from opening the existing program and existing data.  Just prevents new stuff from being applied to it."

In summary, Steen concluded that the server and workstation were scrubbed, although he did not know who was responsible for running scrubbing applications, which he testified could be downloaded for free.  Their purpose, according to Steen, was "to cover your tracks to permanently delete stuff."

## III. DISCUSSION

### A. Denial of Discharge

As a preliminary matter, "[e]xceptions to discharge are narrowly construed in furtherance of the Bankruptcy Code's fresh start policy'" Razzaboni v. Schifano (In re

Schifano), 378 F.3d 60, 66 (1st Cir. 2004)(quoting Palmacci v. Umpierrez (In re Umpierrez),

121 F.3d 781, 786 (1st Cir. 1997)).  That is because "the very purpose of certain sections of

the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of the

bankruptcy code do not play fast and loose with their assets or with the reality of their

affairs." Id. (citing In re Umpierrez, 121 F.3d at 786).

     B. Count I – Denial of Discharge under Section 727(a)(2)(A)

     1. Applicable Law

Section 727(a) provides in pertinent part:

(a) The court shall grant the debtor a discharge, unless-- . . .

> (2) the debtor, with intent to hinder, delay, or defraud a
> creditor or an officer of the estate charged with custody of
> property under this title, has transferred, removed,
> destroyed, mutilated, or concealed, or has permitted to be
> transferred, removed, destroyed, mutilated, or concealed—
>
>> (A) property of the debtor, within one year
>> before the date of the filing of the petition; . . .

11 U.S.C. § 727(a)(2)(A).  In the context of this case, the elements that the Plaintiff must

prove to avoid discharge under this provision are (1) destroying or concealing property,

(2) belonging to the debtor, (3) occurring within one year of filing a Chapter 7 petition,

and (4) made with the actual intent to hinder, delay or defraud a creditor.  In re Schifano,

378 F.3d at 66-67 (citing R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R.

253, 259 (B.A.P. 1st Cir. 1999)).

     With respect to the fourth element, according to the Court in Marrama v. Citizens

Bank of Mass. (In re Marrama), 445 F.3d 518 (1st Cir. 2006),

Because a debtor rarely gives direct evidence of fraudulent intent, we have recognized that, even on summary judgment, intent to defraud a creditor can be proved by circumstantial evidence. *See* In re Varrasso, 37 F.3d 760, 764 (1st Cir. 1994). In weighing evidence of fraudulent intent courts should look to the following "objective indicia":

> (1) insider relationships between the parties; (2) the retention of possession, benefit or use of the property in question; (3) the lack or inadequacy of consideration for the transfer; (4) the financial condition of the [debtor] both before and after the transaction at issue; (5) the existence or cumulative effect of the pattern or series of transactions or course of conduct after the incurring of the debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the events and transactions under inquiry; and (7) an attempt by the debtor to keep the transfer a secret.

In re Watman, 301 F.3d 3, 8 (1st Cir. 2002) (internal citations omitted).

In re Marrama, 445 F.3d at 522.

2. Analysis

The Plaintiff, on the one hand, argues:

Paul and Walter each removed, destroyed, mutilated or concealed – or permitted to be removed, destroyed, mutilated or concealed – the records of the Salvador Agency. Each did so just one week before filing his bankruptcy petition. Each did so with intent to hinder, delay, or defraud D. Kaplan in his position as a judgment creditor. Doing so concealed or destroyed the value of Salvador Agency (which was the property of Paul and Walter), in that it reduced the price Hegarty could obtain for the Salvador Agency and in addition, because it reduced the commissions Bearce actually received on insurance policy renewals, a portion of which are applied to reduce D. Kaplan's judgment. Accordingly, the discharge of Paul and Walter should each be denied under 727(a)(2)(A).

The Defendants, on the other hand, argue that the Plaintiff failed to establish the element

of intent. In particular, citing Nelson v. Peters (In re Peters), 106 B.R. 1, 4 (Bankr. D. Mass.

1989), the Debtors contend that the Plaintiff failed to establish any of the badges of fraud which would evidence fraudulent intent.

The Court concludes that the Plaintiff failed to sustain his burden of establishing that the Defendants "transferred, removed, destroyed, mutilated or concealed" their property.   Their property was not the Insurance Agency's customer lists or computer equipment.  Rather, the Debtors each owned a 50% interest in the Insurance Agency.  The parties agreed that financial statements submitted to Kaplan in September 2007 contained a valuation for the Insurance Agency of $1 million (each Debtor's interest was valued at $500,000).  Although, the Plaintiff contends that the financial statements were false, the Plaintiff submitted no definitive evidence of what the Insurance Agency was worth either in 2007 or seven years later within one year of the date of the filing of the petition when the Bearce Insurance Agency, Inc. agreed to acquire it.   The Plaintiff introduced no tax returns for the Insurance Agency, and there was no conclusive evidence of what Bearce's agency ultimately will pay for the Insurance Agency over the four year period beginning on March 18, 2014.   Although Bearce testified that he anticipated paying "[s]omewhere north of $500,000," at the inception of his agreement with the Receiver, the evidence was speculative and conjectural.   Under the circumstances, the Court concludes that the Debtors did not intentionally destroy the value of their 50% ownership interests in the Insurance Agency, particularly where P. Salvador testified that he was winding down his involvement in the business of the Insurance Agency.

C. Denial of Discharge under Section 727(a)(3)

1. Applicable Law

Section 727(a)(3) provides:

(a) The court shall grant the debtor a discharge, unless — . . .

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case. . .

11 U.S.C. § 727(a)(3).  With respect to § 727(a)(3), the United States Bankruptcy Appellate

Panel for the First Circuit recently addressed the purpose of, and elements of proof under,

this section in Harrington v. Simmons (In re Simmons), 525 B.R. 543 (B.A.P.1st Cir. 2015),

aff'd, 810 F.3d 852 (1st Cir. 2016). In that case, the panel stated:

"The purpose of § 727(a)(3) is to give creditors, the trustee and the bankruptcy court complete and accurate information concerning the debtor's affairs and to ensure that dependable information is provided so that the debtor's financial history may be traced." Canha v. Gubellini (In re Gubellini), No. 09–016, 2009 WL 8466789, at *4 (1st Cir. B.A.P. Nov. 23, 2009) (footnote omitted) (citing Meridian Bank v. Alten, 958 F.2d 1226, 1230 (3d Cir. 1992)). The standard for disclosure of records for purposes of § 727(a)(3) is one of "reasonableness in the particular circumstances." Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 68 (1st Cir. 2004) (internal quotations and citations omitted). "[A]n impeccable system of bookkeeping" is not required; however, "the records must sufficiently identify the transactions [so] that intelligent inquiry can be made of them." Id. at 69 (internal quotations and citations omitted). The inquiry into the reasonableness of records may include several relevant factors such as "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor or his business; and any other circumstances that should be considered in the interest of justice." Id. at 70 n.3 (internal quotations and citations omitted).

In re Simmons, 525 B.R. at 547. This Court analyzed the burden of proof and elements of

proof under this section in Lassman v. Mahfouz (In re Mahfouz), 529 B.R. 431, 445 (Bankr.

D. Mass. 2015), stating:

> Section 727(a)(3) involves a shift in the burden of proof. "The initial burden
> is on the party objecting to discharge to prove two things: (i) that the debtor
> 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any
> recorded information;' and (ii) that the recorded information was
> information 'from which the debtor's financial condition or business
> transactions might be ascertained.'" Lassman v. Keefe (In re Keefe), 380 B.R.
> 116, 120 (Bankr. D. Mass. 2007). Once the objecting party has met its initial
> burden, the burden then shifts to the debtor to establish either that the
> debtor maintained adequate books and records from which his financial
> condition can be ascertained or that the failure to keep adequate books and
> records can be justified under the circumstances. Cohen Steel Supply, Inc.
> v. Fagnant (In re Fagnant), No. 03–10496–JMD, 2005 WL 1244866, at *3
> (Bankr. D. N.H. Apr. 14, 2005) (citations omitted), aff'd, 337 B.R. 729 (1st Cir.
> BAP 2006). Intent to conceal a debtor's financial condition is not a necessary
> element to support an objection to discharge for failure to keep books and
> records. Thaler v. Erdheim (In re Erdheim), 197 B.R. 23, 29 (Bankr. E.D.N.Y.
> 1996).

In re Mahfouz, 529 B.R. at 445.  In Mahfouz, the issue presented was whether joint debtors

could be denied a discharge for failure to keep or preserve records of closely held

corporations they owned.  In holding that the Trustee had sustained his burden of proof

under § 727(a)(3), this Court ruled that the debtors' failure to adequately document both

their personal and business income, expenses, assets and transfers in a manner sufficient

to ascertain their financial condition and business transactions warranted the denial of

their discharge. In re Mahfouz, 529 B.R. at 454.

In Ne. Cmty. Bank v. Manfredonia (In re Manfredonia), 561 B.R. 1 (Bankr. D. Mass.

2016), this Court observed the following:

Failure to keep adequate corporate records has been found by some courts to be a valid reason for denial of an individual's discharge under § 727(a)(3) where a debtor was the sole owner of, and conducted business through, a closely held corporation. *See* <u>Wachovia Bank, N.A. v. Spitko (In re Spitko)</u>, 357 B.R. 272, 308 (Bankr. E.D. Pa. 2006)(court concluded that the financial records of closely held entities were needed for the trustee and creditors to have accurate information concerning the debtors' assets that might be available for liquidation); <u>Sterling Int'l, Inc. v. Thomas (In re Thomas)</u>, No. 01–6321, 2003 WL 21981707, at *11 (Bankr. D. Idaho July 17, 2003) ("[I]n situations where the facts indicate that a debtor exercised control over and conducted business through a closely held corporation, § 727(a)(3) inquiries cannot be artificially limited to those records that are, strictly speaking, those of the debtors."); *see also* Alan N. Resnick and Henry J. Sommer, 6 Collier on Bankruptcy ¶ 727.03[3][e](16 ed. rev. 2015).

There are no per se rules for the adequacy of records. Section 727(a)(3) does not require completeness in a debtor's records, but it does require sufficient records so that creditors and the trustee can accurately ascertain the debtor's financial condition. *See* <u>Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)</u>, 550 F.3d 755, 761 (9th Cir. 2008). A debtor need not have an impeccable system of bookkeeping; however, a debtor must have records which sufficiently identify transactions to permit inquiry about the debtor's financial status and to ascertain a complete and accurate picture of the debtor's financial affairs, including a debtor's business as well as personal finances and activities. *See* <u>Razzaboni v. Schifano (In re Schifano)</u>, 378 F.3d 60, 69–70 (1st Cir. 2004). Sophisticated business persons are generally held to a higher level of accountability for record keeping than less experienced debtors. *See* <u>Meridian Bank v. Alten</u>, 958 F.2d 1226, 1231 (3d Cir. 1992).

<u>In re Manfredonia</u>, 561 B.R. at 18.

2. Analysis

The Plaintiff argues that he presented substantial evidence that the Debtors "concealed, destroyed [or] mutilated" and failed to preserve both paper and electronic records information of the Insurance Agency, a closely held corporation, from which the Debtors' financial condition or business transactions might have been ascertained.

The Debtors maintain that Steen's testimony should be rejected because he was unable to state that the documents that had been deleted from the computer were deleted intentionally.

With respect to the Plaintiff's claim under § 727(a)(3), the Court concludes that the Plaintiff sustained his burden of proof, namely that the Debtors failed to keep or preserve recorded information - - information from which their financial condition or business transactions might be ascertained.  Specifically, the Debtors, who were successful and sophisticated businessmen, failed to keep and preserve up-to-date records in any format. The Court credits Hegarty's testimony that the Debtors initially told him that they did not possess a scanner.  The Court discredits the Debtors' testimony that the scanner was part of the copier and that the office was totally "paperless."  Regardless of whether the Insurance Agency owned a scanner and the agency was "paperless," however, the Court is persuaded by Hegarty's testimony that it was "not possible to be completely paperless."  Thus, the Court also concludes that the Debtors or their agents or family members failed to keep sufficient paper records as the only paper files turned over to the Receiver were old and useless "dead" files.

There is ample evidence that the Debtors or their agents or family members who had access to the Insurance Agency's server, caused the removal or destruction of the Insurance Agency's records, including customer lists kept on its AMS Prime software and financial records in QuickBooks. Steen testified unequivocally that files were intentionally removed from the server, although he could not ascertain why this was done.  The Court concludes that the Debtors ortheir agents or family members were

motivated to do so by virtue of the absence of a prohibition against competition with the acquirer of the Insurance Agency.  Thus, they had every incentive to wipe out and erase information on the Insurance Agency's server so as to be able to solicit clients of the former Insurance Agency, using the books, records and/or customer lists of the Insurance Agency that should have been turned over to the Special Commissioner and which were part of the assets sold to the Bearce Insurance Agency, Inc.

The Debtors failed to preserve recorded information from which their financial information and business transactions could be ascertained, and, at worst, permitted their agents or children to deliberately destroy and appropriate recorded information from which their financial condition might be ascertained.  The Court rejects W. Salvador's testimony that failure to pay for the AMS system would result in its discontinuance and a concomitant loss of information.  Steen convincingly testified to the contrary.  More significantly, Steen was able to ascertain that various folders on the server were accessed and "last modified" on February 3, 2014, February 5, 2014 and February 6, 2014.  The digital "fingerprints" discovered by Steen, while not enabling him to testify as to the reason the server was "scrubbed," did enable him to ascertain that the deletion of files was intentionally done.  This Court, however, can infer that the Debtors were motivated to conceal the financial condition of their business to benefit the next generation of Salvadors who opened their own insurance agency.

**IV. CONCLUSION**

In view of the foregoing, the Court shall enter a judgment in favor of the Debtors and against the Plaintiff on Count I and a judgment in favor of the Plaintiff and against the Debtors on Count II.  The Debtors' discharge is denied under 11 U.S.C. § 727(a)(3). Count III is moot.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  April 12, 2017